## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRITTANY EADY,<br><br>               *Plaintiff*,<br><br>   v.<br><br><br>TRULY ORIGINAL, LLC, and<br>BRAVO MEDIA LLC<br><br>               *Defendants*. | **COMPLAINT**<br><br>Case No.  25-cv-9683<br><br>**Jury Trial Demanded** |

## INTRODUCTION

1.      This case concerns Defendants' grotesque sexual harassment of Plaintiff Brittany Eady, a castmate on Season 16 of *Real Housewives of Atlanta*.  In June 2024, Eady was the victim of a castmate's brazen attempt at so-called "revenge porn."  Specifically, the castmate published to a group of hundreds of live onlookers—including Defendants' cameras—a photograph of a woman engaged in a graphic sex act and told the audience the woman was Eady.  Defendants immediately knew the castmate's behavior was atrocious, and wrong, and that Eady had no reason to expect anything like it.  The other castmates that were present were horrified and left the event immediately, an unsurprising reaction given that nothing similar had ever occurred on *Real Housewives* before.  Defendants even made the unprecedented decision to suspend the offending castmate mid-season because of it.  Yet, despite initially recognizing the depravity of the castmate's sexual harassment of Eady—and in the face of Eady's repeated protestations—Defendants ultimately made the disgusting decision to leverage it at Eady's great expense.  They pressured Eady to discuss the incident and her sexual history on camera—and in front of her own mother, no less.  And when Eady pushed back and invoked her legal rights, they retaliated against her.  Rather than protect Eady from the harmful effects of her co-worker's sexual harassment, Defendants

chose to amplify the event and repeatedly re-traumatize Eady with it. Over months, Defendants traded on the graphically sexualized nature of the events to coerce Eady into traumatic workplace discussions of her life's most intimate sexual moments. This was not *"Real Housewives* as usual"—it was sexual harassment and it was retaliation, and Eady brings this case to hold Defendants to account for their horrific behavior.

*     *     *

2.      The graphic pornographic photo at issue appeared to depict a woman performing fellatio on an unidentified man and was presented to a group of about 200 live onlookers by a fellow castmate on the show, Kenya Moore.

3.      Moore represented to the audience (and the audience believed) that the woman in the photograph was Eady, but it was not, a fact that Eady did not come to learn until nearly a year later.

4.      Moore and Eady were at the time embroiled in an interpersonal dispute and the presentation of the photograph was a classic attempt at "revenge porn," otherwise known as non-consensual intimate image sharing.

5.      Revenge porn has of late garnered significant attention nationwide due to its proliferation, leading to laws around the country punishing its use, including under Federal, New York, and Georgia law.

6.      In attendance at that event were nearly a dozen of Defendants' camerapeople who had been filming for content to air on the show and that had captured Moore's presentation of the graphic pornographic photo.

7.      Defendants knew immediately that Moore's presentation of that photo was beyond the pale, hugely improper, and well beyond the show's standards, expectations, and stated sexual

harassment policies.

8.    Indeed, just a week after the event—*i.e.*, a year before they made any decision as to whether to air the events on the show—Defendants conducted an internal investigation into Moore's conduct which led them to suspend Moore from the show.

9.    Further, Eady repeatedly informed Defendants of her view that Moore's conduct was harassing and unlawful and that she intended to seek legal relief.

10.    Despite Defendants' immediate appreciation that the presentation of the graphic pornographic photo was improper and beyond the bounds of the show's standards (or any workplace), however, Defendants made the decision at the heart of this lawsuit: they decided to leverage Moore's attempt at revenge porn at Eady's great expense.

11.    Specifically, over Eady's persistent objection, they pressured Eady to discuss the incident and her sexual history with the show's producers and in front of the show's cameras.

12.    They sought to gaslight Eady into thinking it was in her interest to discuss these highly-personal sexual issues.

13.    They told her it could be just like the "Kardashian sex tape," meaning Eady should use this hyper-sexualized exposure to obtain further publicity for herself.

14.    They said, in sum and substance, that she should "get it all out," and "take control of the narrative," because "the better we get this out, the better the fans will understand and have empathy for you."

15.    When Eady pushed back and said she wanted no part of this, Defendants effectively said if she did not discuss the incident on camera she would face less and potentially no camera time and may lose out on pay.

16.    At first, Eady relented to this enormous pressure, and ultimately discussed her most

intimate personal and sexual moments with Defendants' producers and in front of their cameras.

17.    Defendants thereafter chose to air many of these discussions to the world (again, despite their recognition that Moore's conduct was beyond their show's standards, expectations, and policies).

18.    All the while, Defendants continually rejected Eady's efforts to investigate the incident herself, even refusing to allow her to see the photograph that Moore presented, which would have revealed to Eady that the photograph was not even her (and/or that it was a "deepfake").

19.    Then, Defendants twisted the knife in another grotesque display of sexual harassment and retaliation.

20.    They told Eady that they were planning to invite Moore back to the show for the following season and that if Eady herself wanted to be on the show next season, it would mean that she would have to do so alongside Moore, her harasser.

21.    Enough was enough—shortly thereafter Eady announced that she would not be returning to the show.

22.    No one would dispute that *The Real Housewives* franchise trades on drama, and often highly inter-personal drama.  But it has never traded on *this* type of graphic sexual drama before, for obvious reasons: it is disgusting, beyond the pale, and illegal.  No one signing up to appear on *The Real Housewives* would expect it and Eady certainly did not.  Defendants have no immunity from sexual harassment and anti-retaliation prohibitions, and their conduct unquestionably fits within them.  Eady brings this action under those laws, and the law prohibiting intentional infliction of emotional distress, breach of contract, and negligence, to hold Defendants' accountable for their unlawful and unjustifiable actions.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and is between citizens of different States.  *See infra* at ¶¶ 27-30.

24.    This Court has jurisdiction over each of the Defendants because each has their principal place of business in New York, New York and/or does business on a continuous and systematic basis in New York, New York.  *See* CPLR § 301.  This Court also has jurisdiction over Defendants because they each transact business in New York and committed a tort in New York, and Eady's claims arise from such transacting of business in New York and commission of a tort in New York.  *See* CPLR § 302.

25.    Venue is proper in this Court because each Defendant resides in this District, because each is subject to personal jurisdiction here, *see* 28 U.S.C. 1391(b)(1), (b)(3), (c)(2), and because a substantial part of the events or omissions giving rise to Eady's claims occurred in this District, *see* 28 U.S.C. § 1391(b)(3).

26.    This action arises out of a sexual harassment dispute and Eady elects to invalidate any potentially applicable predispute arbitration agreement.  *See* 9 U.S.C. § 402(a).

## PARTIES

27.    Plaintiff Brittany Eady was a cast member on Season 16 of *The Real Housewives of Atlanta*, is a woman, and is a domiciliary of the state of Georgia.  Thus, for purposes of determining diversity, Eady is a citizen of Georgia.

28.    Defendant Truly Original LLC ("Truly") is a media production company with its principal place of business in New York, New York, known for the production of unscripted reality television series.  On information and belief, Defendant Truly's sole member is Endemol USA

Holding, Inc., which is incorporated under the laws of Delaware and has a principal place of business in California.  Thus, for purposes of determining diversity, Defendant Truly is a citizen of Delaware and California.

29.     Defendant Bravo Media LLC ("Bravo") is a cable television network company with its principal place of business in New York, New York.  On information and belief, Defendant Bravo's sole member is Bravo Holding LLC, whose sole member is NBC-Rainbow Holding LLC; NBC-Rainbow Holding LLC has three members: (i) NBC Stations Management II LLC, whose sole member is NBC Stations Management LLC; (ii) NBC Stations Management LLC, whose sole member is NBCUniversal Media LLC, which as discussed *infra*, is a citizen of California, Delaware, and Pennsylvania for purposes of diversity; and (iii) NBC Cable Entertainment Holding LLC, whose sole member is NBCUniversal Media LLC, which as discussed *infra*, is a citizen of California, Delaware, and Pennsylvania for purposes of diversity.   Thus, for purposes of determining diversity, Defendant Bravo is a citizen of California, Delaware, and Pennsylvania.

30.     On information and belief, NBCUniversal Media, LLC's sole member is NBCUniversal, LLC, which has seven members: (i) Comcast Navy Acquisition, LLC; (ii) Comcast Navy Contribution, LLC; (iii) NBCUniversal Enterprise, Inc., which is incorporated in Delaware and has a principal place of business in Pennsylvania; (iv) Comcast DW Holding, Inc., which is incorporated in Delaware and has a principal place of business in Pennsylvania; (v) Comcast CCW Holdings, LLC; (vi) Comcast Snap Holdings, LLC; and (vii) SNL Entertainment Holdings, Inc., which is incorporated in Delaware and has a principal place of business in Pennsylvania.  On information and belief, the members of Comcast CCW Holdings, LLC and Comcast Snap Holdings, LLC are (i) Comcast Navy Acquisition, LLC and (ii) Comcast Snap Holdings, Inc., which is incorporated in Delaware and has a principal place of business in

Pennsylvania; the sole member of Comcast Navy Acquisition, LLC is Comcast Corporation, which is incorporated in Pennsylvania and has a principal place of business in California. On information and belief, Comcast Navy Acquisition, LLC has seven members: (i) Comcast SportsNet New England Holdings, LLC; (ii) Comcast SportsNet Philadelphia Holdings, LLC; (iii) Versus Holdings, LLC; (iv) Comcast CHC, LLC; (v) Comcast Contribution Holdings, LLC; and (vi) E! Holdings, Inc., which is incorporated in Delaware and has its principal place of business in Pennsylvania. On information and belief, the members of Comcast SportsNet New England Holdings, LLC are (i) Comcast SportsNet NE Holdings, Inc., which is incorporated in Delaware and has a principal place of business in Pennsylvania; and (ii) CSNNE Partner, LLC, whose sole member is Comcast Holdings Corporation, which is incorporated in Pennsylvania and has its principal place of business in Pennsylvania; the members of Comcast SportsNet Philadelphia Holdings, LLC are (i) Comcast Holdings Corporation, and (ii) Comcast Spectator Holding Company, LLC, whose sole member is Comcast Holdings Corporation; the members of Versus Holdings, LLC are (i) Comcast Holdings Corporation, and (ii) E! Holdings, LLC; the sole member of Comcast CHC, LLC is Comcast Holdings Corporation; and the sole member of Comcast Contribution Holdings, LLC is Comcast Corporation. Thus, for purposes of determining diversity, Defendant NBCUniversal Media, LLC is a citizen of California, Delaware, and Pennsylvania.

## STATEMENT OF FACTS

### I.    The Real Housewives of Atlanta

31.    *The Real Housewives* is a franchise of reality television programs that features casts of prominent women in various cities.

32.    The programs follow the social lives, business dealings, and relationships of the cast members, and often focus on interpersonal drama between the cast members.

33.    While arguments between cast members are common, the tenor of the franchise is generally lighthearted and depicts the lives of women who "lead glamorous lives."

34.    As a general matter, the show's content is not sexualized or pornographic in nature.

35.    Despite the show's use of the term "housewives" to describe its cast members, the women featured on the show often have prominent careers that feature heavily on the show.

36.    On information and belief, *The Real Housewives* franchise premiered in or around March of 2006.

37.    *The Real Housewives of Atlanta* ("RHOA") is a reality television series within the *Real Housewives* franchise that follows a cast of women based in Atlanta, Georgia.

38.    RHOA is produced by Defendant Truly and airs on Defendant Bravo's television network.

39.    Defendants Truly and Bravo retain casting agencies to find and audition participants to appear on RHOA.

40.    On information and belief, RHOA premiered in or around 2008.

41.    Defendants Truly and Bravo exert a high degree of control over the actions of producers on its programs, including RHOA, regardless of whether the producers are employees, agents, and/or contractors of Defendants.

II.    **Defendants Actively Pursue Eady to Become an RHOA Cast Member**

42.    Prior to her appearance on RHOA, Eady was a prominent and successful businesswoman in Atlanta.

43.    She previously modeled and appeared in music videos, and at all relevant times ran an insurance business for high-end, luxury clients and coached others in the insurance industry.

44.    In 2021, a friend of Eady's who had appeared on a different *Real Housewives*

franchise referred her to a casting director.

45.     Eady had rarely if ever watched RHOA but was familiar with the premise and had heard of many of the cast members.

46.     Eady had multiple calls with RHOA's casting director and representatives from RHOA's casting agency but was initially told that the agency would not move forward with the casting process because Eady was too young.

47.     Two years later, however, in August of 2023, a different casting agent contacted Eady by text about the potential of her auditioning for RHOA.

48.     The casting agent's outreach to Eady was unsolicited.

49.     At that time, Eady decided that she did not want to appear on RHOA.

50.     In August of 2023, Eady replied to the casting agent and stated that it was not a good time for her to appear on the show because she was just starting a business and was wary of the potential for bad press and reputational damage.

51.     In November of 2023, the same casting agent again reached out to Eady and asked if Eady was interested in interviewing for RHOA.

52.     At this time, Eady agreed to participate in the casting process.

53.     The casting agent connected Eady to Diona Vaughan Mankowitz, the casting director for RHOA.

54.     On information and belief, Vaughan Mankowitz was at all relevant times an employee or agent of Divergent Content, a casting and development company that specializes in unscripted content, including reality television.

55.     On information and belief, one or both Defendants retained Divergent Content to cast participants for Season 16 of RHOA and authorized Divergent Content to act as its agent and

make representations to potential participants about the show, including the associated talent contracts.

56.     In November of 2023, Eady participated in a Zoom interview with McKayla Martinez and Kira Coplin, who, on information and belief, were at all relevant times employees or agents of at least one of the Defendants and were casting producers for RHOA.

57.     At that interview, Eady was asked about her knowledge of the housewives, social circles, TV experience, job, relationship status, reasons for wanting to join the show, and thoughts on the cast and the show.

58.     During the November 2023 interview, Eady asked the casting producers about the possibility of fights and drama between cast members.

59.     Eady stated that she was nervous about appearing on the show because of the potential for fighting amongst the cast.

60.     Martinez and Coplin stated on this Zoom call, however, that the upcoming season would be a "reboot" with a "new vibe" and more "lighthearted," "fun and flirty," and "glamorous" than previous seasons, and that the show was moving away from high-drama content.

61.     After Eady's initial interview, Eady was selected to move forward in the casting process.

62.     In January 2024, Eady participated in an additional interview over Zoom with Executive Producers Lorraine Haughton-Lawson, Lauren Eskelin, Glenda Cox, and Kemar Bassaragh.

63.     On information and belief, at all relevant times, Haughton-Lawson was employed by Defendant Truly as a Special Vice President of Programming.

64.     On information and belief, at all relevant times, Eskelin was employed by

Defendant Truly as an Executive Vice President of Programming.

65.    On information and belief, at all relevant times Cox was employed by Defendant Truly.

66.    On information and belief, at all relevant times Bassaragh was employed by Defendant Bravo.

67.    During the January 2024 interview, the above-named producers asked Eady about her background, family dynamics, relationship history, and how she would interact with other housewives.

68.    During the January 2024 interview, the above-named producers also again represented to Eady that the upcoming season would be "lighthearted" and "fun," and that it would be the "biggest shakeup" RHOA had seen in its 15 years and that it was a "reboot" for the show.

69.    After the January 2024 interview, Eady participated in at least two additional interviews with producers of RHOA.

70.    On information and belief, each producer that Eady met with was employed by one or both of the Defendants.

71.    After the third interview, Eady was asked to participate in a "chemistry test" filming in February of 2024.

72.    For the chemistry test filming, executives from Defendants Truly and Bravo were to fly from New York City to Atlanta to meet Eady in person and spend a day filming her and her husband.

73.    Prior to the chemistry test, Eady was provided by Defendant Truly an agreement that would govern the terms of the chemistry test filming (the "Chemistry Test Agreement").

74.    Contained within the Chemistry Test Agreement was a broad release of any and all

possible past and future legal claims of any kind that in any way related to Eady's involvement in the chemistry test.

75.    For example, the release contained within the Chemistry Test Agreement did not carve out any intentional torts or violations of workplace protection and non-discrimination laws from the release of claims.

76.    Further, the Chemistry Test Agreement did not contain any provision restraining Defendant Truly from filming Eady while she was nude or engaged in sexual activity.

77.    Based on the breadth of the releases in the Chemistry Test Agreement, Eady was concerned that she would be signing away any protections she had against being intentionally harmed in the filming of the chemistry test or having her privacy violated beyond any reasonable expectation while filming.

78.    On February 21, 2024, Vaughan Mankowitz texted Eady to check in.

79.    Eady responded by text, "Hey! Still Talking with husband. Not looking good right now b/c of release."

80.    Vaughan Mankowitz responded, "BRITT!! Don't make the appearance release your hill to die on."

81.    Eady responded, "You have seen a copy of the release?"

82.    Vaughan Mankowitz responded, "I have . . . it's pretty standard and everyone has signed it to appear on camera."

83.    Vaughan Mankowitz also stated: "Keep in mind the appearance release is not the actual contract for being on the show."

84.    The next day, Vaughan Mankowitz reached out again by text and wrote, "Need to know where you stand by noon tomorrow so keep me posted."

85.     Eady responded in relevant part, "I'm not comfortable signing that release due to giving up all my rights, so I understand if that forfeits my opportunity with RHOA. If anything changes with a new release let me know, if not I totally understand, I just know in my heart I know better [than] signing that contract."

86.     Vaughan Mankowitz requested to speak to Eady on the phone, to which Eady agreed.

87.     During that subsequent telephone conversation, Vaughan Mankowitz repeatedly pressured Eady not to back out of the audition process with RHOA.

88.     Vaughan Mankowitz told Eady that she could not change her mind if she backed out and repeatedly emphasized that appearing on the show would lead to "amazing" opportunities, listed cast members who had become famous and successful after appearing on the show, and told Eady that she would be a fan favorite.

89.     She told Eady, "don't let this be the hill that you die on," with the "this" referring to the broad release agreement they were asking her to sign.

90.     Due to Vaughan Mankowitz's pressure and reassurances, and the fact that the Chemistry Test Agreement was not the final agreement that would govern Eady's full participation on the show, Eady decided to continue with the audition process, sign the agreement, and film the chemistry test with her husband and her mother.

91.     In or around March of 2024, Eady was officially offered a role on RHOA.

92.     After Eady was offered a role on RHOA, she was sent a draft Talent Agreement between herself and Defendant Truly for her appearance on RHOA.

93.     Eady and her attorney reviewed the Talent Agreement carefully, with Eady informing an RHOA producer: "My attorney and myself have already reviewed and gone thru

13

everything."

94. By its terms, the Talent Agreement superseded the Chemistry Test Agreement.

95. The Talent Agreement defined the "Studio" to mean Defendant Truly and "Network" to mean "one or more of the television networks or platforms (e.g., Peacock streaming platform) of NBCUniversal Media, LLC or its related and/or affiliated entities," which includes Defendant Bravo.

96. The Talent Agreement further defined "Artist" to refer to Eady.

97. The Talent Agreement referred to Eady's "employment hereunder," Eady's "employment under this Agreement," Eady's "period of employment," or "Artist's employment," thirty-four (34) times.

98. Under the terms of the Talent Agreement, the Studio (*i.e.*, Defendant Truly) and the Network (*i.e.*, Defendant Bravo) were afforded the right to exercise significant control over the time, place, and manner of Eady's work as a cast member of RHOA.

99. Meanwhile, Eady was prohibited by the Talent Agreement from activities such as engaging in unscripted programming with any other studio, appearing as herself in scripted programming, or promoting any brand without the Network's approval, and was required to hold her work for the Studio as first priority during the exclusivity period.

100. Notably, the Talent Agreement stated that "Studio shall not film Artist . . . while Artist is engaging in actual sexually explicit conduct, or . . . while Artist is nude."

101. It was particularly important to Eady that the Talent Agreement not allow Defendants to film or air her nude without her consent, a protective provision that was not included in the earlier Chemistry Test Agreement.

102.    The Talent Agreement contained a release of claims, "to the maximum extent permitted by law," but only as to claims that were directly or indirectly caused by "negligent acts" arising out of or relating to the series.

103.    The release explicitly excluded claims for violation of the New York State Human Rights/Executive Laws and "other claims that may not be released by reason of applicable law."

104.    Thus, as accurately previewed by Vaughn Mankowitz, the release in the Talent Agreement was far less encompassing than the release in the Chemistry Test Agreement, with which Ms. Eady had been highly concerned.

105.    The Talent Agreement also included specific provisions covering Defendant Truly's commitment to anti-discrimination, anti-harassment, and anti-retaliation policies.

    a.  "Artist's employment hereunder shall be subject to Studio's and Network's other applicable policies and procedures as may be amended from time to time, including, without limitation, rules of conduct, such as providing a respectful workplace (including anti-harassment and anti-discrimination), prohibition of violence in the workplace, and relating to the consumption of alcohol and drugs (collectively, '**Production Policies**')."

    b.  It stated that its publicity and confidentiality policies shall not prevent Eady from "discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that Artist has reason to believe is unlawful."

    c.  "[I]f Artist has reason to believe that conduct violating any Studio policy, including but not limited to the Respect in the Workplace policy, has occurred or is occurring in the workplace, Artist is encouraged to report such conduct through Studio's appropriate channels or through the channels provided by Network so it can be promptly addressed. Artist will not be retaliated against for, or in connection with, reporting such conduct."

    d.  "In connection with Artist's Services, Artist may be in an environment where Artist may hear, see, or encounter speech or physical contact, or otherwise experience sensations, that Artist or others may consider offensive. Artist shall immediately notify Studio if for any reason Artist feels harassed (e.g., due to Artist's race, nationality, sex, age, disability, sexual orientation or marital status), threatened or otherwise uncomfortable in connection with Artist's Services, and Artist

15

understands that Studio shall not, and shall not authorize anyone else to, penalize or retaliate against Artist for doing so."

106.    The Talent Agreement selected New York law as governing law, and the parties agreed to venue and jurisdiction in the Supreme Court of the State of New York in New York County and the United States District Court for the Southern District of New York.

107.    Eady signed the Talent Agreement on April 19, 2024.

108.    On May 10, 2024—three days before filming began—Jacob Halajian, Director, Business and Legal Affairs at Defendant Truly, sent Eady and each other castmate an email titled: "Truly Original / Anti-Violence & Anti-Harassment Policies."

109.    The body of the email read in part, "Hi ladies, Please review Truly's **Respect in the Workplace Policy** and **Talent Legal Guidelines** before filming resumes on 'The Real Housewives of Atlanta.'"

110.    Attached to the email was a document referred to in the Talent Agreement and titled, "Truly Original LLC: Respect in the Workplace Policy" ("Truly RITW Policy").

111.    The Truly RITW Policy outlined a series of robust and specific commitments from Defendant Truly to avoid sexual harassment and retaliation, including the following:

   a.  "[Truly] is committed to providing a professional and respectful work environment where everyone is treated fairly and with dignity. In support of this commitment, the Company prohibits discrimination, harassment, bullying and retaliation in the workplace or work-related settings." "This policy applies to the Company's applicants and employees (co-workers, supervisors, and managers). As used in this policy, the term "employee" includes contractors and volunteers in the workplace. In addition, this policy applies to conduct at work and in work-related settings whether on Company premises or off-site, and whether during or outside of regular work hours. This includes during work-related travel, on production locations, during social events with colleagues (including vendors or other business partners), and on social media sites."

   b.  "HARASSMENT PROHIBITED."

   c.  "Harassment is a type of discrimination" and "includes conduct that creates a disrespectful, intimidating, hostile, degrading, or offensive

16

work environment for another individual based on one or more protected characteristic." It stated that harassment can be "verbal" and, significantly, "visual (such as the posting or distribution of offensive posters, symbols, cartoons, drawings, computer displays, or emails)."

d. Sexual harassment "is generally categorized into two types:" quid pro quo harassment and hostile work environment harassment. It stated that quid pro quo harassment could be "[s]ubmission to sexual conduct is made explicitly or implicitly a term or condition of an individual's employment" or "[s]ubmission to or rejection of the conduct by an employee is used as the basis for employment decisions affecting the employee."

e. The Policy defined hostile work environment harassment as "[c]onduct that has the purpose or effect of unreasonably interfering with an employee's work performance or of creating an intimidating, hostile, or offensive working environment due to or based on gender." One example it listed was "[d]isplaying or distributing sexually suggestive or derogatory objects, pictures, cartoons, or posters or any such items." It noted that "[o]ther types of conduct may constitute sexual harassment under this policy or applicable law."

f. "RETALIATION PROHIBITED."

g. "The Company strictly prohibits retaliation against any individual who, in good faith, raises a concern (internally or to an appropriate government agency or tribunal) about, or otherwise opposes, discrimination, harassment, bullying, or retaliation, or other behavior this policy prohibits, even if the concern proves to be unfounded or the investigation is inconclusive." Prohibited retaliation, it explained, "includes demotion, suspension, threats of discharge, or other adverse employment action, or other harassment or intimidation as a result of reporting a concern or participating in an investigation as described above."

112.    Just days before filming, Cox again told Eady that this season of RHOA would be glamorous, emphasize fashion, and have a fun, "Sex and the City meets Selling Sunset" vibe, with less drama.

## III.    Kenya Moore, an RHOA Castmate, in a Classic Attempt at Revenge Porn, Sexually Harasses Eady by Publishing a Graphic Pornographic Photograph Purportedly Depicting Eady During a Filmed Cast Event

113.    On May 13, 2024, filming for Season 16 of RHOA began.

114.    During filming, Eady developed an interpersonal dispute with a long-time cast member, Kenya Moore.

17

115.    On information and belief, Moore had signed a Talent Agreement with Defendant Truly that was nearly identical to Eady's except that her rate of pay was higher due to her tenure.

116.    On information and belief, in the spring of 2024, Moore began to develop a concept for a new hair salon she wanted to open in Atlanta, GA.

117.    Moore then used the platform of RHOA to promote the launch of the salon.

118.    Specifically, on June 6, 2024, Moore, Eady, producers from Defendants' companies, and other employees of the Defendants filmed material for an episode of RHOA during the opening of Moore's salon (hereinafter, the "Salon Event").

119.    On information and belief, Moore's salon qualified as a "Featured Artist Business" under Section 6(b)(i)(A) of her Talent Agreement, which meant that if the business achieved a certain amount of revenue, Moore would be required to pay the Network a portion of that revenue.

120.    On information and belief, the Salon Event occurred on a "premises," and was an "event[] or activity[]," for which Moore "own[ed] and/or control[led] all such access rights," and therefore under the terms of Moore's talent agreement, she "irrevocably granted [the networks] access to (including, without limitation, permission to film and otherwise make recordings in and of)" the Salon Event.

121.    The Salon Event was described to the cast members as an "all-cast event," which meant that every cast member was required to attend.

122.    On information and belief, Moore also invited various members of the media to attend the Salon Event, including prominent gossip bloggers.

123.    On information and belief, Defendants required Moore to submit a guest list in advance of the Salon Event and had the power to approve or decline any proposed guest on Moore's list, meaning that the Defendants knew and approved of the presence of these additional

18

members of the media.

124.    Prior to the Salon Event, Eady expressed to the producers that she did not want to attend because of the interpersonal conflict that had developed between herself and Moore.

125.    Eady believed that her attendance at the Salon Event would cause an unwanted escalation of tension between herself and Moore.

126.    In response, Shanae Humphrey, an RHOA producer who, on information and belief, was employed by Defendant Truly at all relevant times, had an argument with Eady in Eady's home and told Eady, in sum and substance, that it was her job to attend the Salon Event, that it was mandatory, and that she did not have a choice.

127.    Eady, in response, said that she was not ready for the drama the Salon Event would entail, that she felt like it was a set-up, and that she was terrified that her attendance at the Salon Event would cause tensions to escalate further.

128.    Humphrey responded, in sum and substance, that it did not matter how Eady felt if it was not on camera.

129.    Prior to the Salon Event, Eady also spoke to a Human Resources representative from Defendant Truly, who advised her, in sum and substance, that it was possible that Moore would do something to embarrass Eady at the Salon Event, but that Eady should go anyway and leave quickly.

130.    Despite the conflict between Eady and Moore, Defendants required Eady to appear at the Salon Event and represented to Eady that she could be fired if she did not attend.

131.    Each cast member was required to wear a microphone provided by Defendants during the filming of the Salon Event.

132.    Employees of Defendants circulated at the Salon Event to ensure that the

microphones were functional and to replace batteries as needed.

133.    Also present at the Salon Event were numerous other employees of Defendants, including at least one director and multiple operators for approximately ten cameras that recorded various angles and spaces in the event.

134.    In total, approximately two hundred people attended the Salon Event live, including cast members of RHOA, their families and friends, and other employees or representatives of the Defendants.

135.    Eady arrived at the Salon Event at the time scheduled by Defendant Truly's production team and left shortly thereafter.

136.    After Eady left the Salon Event, Moore began to give a speech to the event's attendees.

137.    Rather than focus her speech on the salon that she was opening, however, Moore unusually focused her comments on Eady, making a variety of statements about Eady, including false and derogatory statements about her profession, character, and personal sexual history.

138.    Moore displayed posterboards which included shocking and derogatory accusations about Eady, certain actual photographs of Eady, and (as alleged further below) at least one explicit photograph that was purported to depict Eady (but which in reality did not).

139.    Moore stated, "I did some research and I found out who this bitch is," suggesting that the statements that would follow were facts that had been discovered by Moore.

140.    Moore also stated that she had "private investigators" research Eady and that she was showing what they had found.

141.    Moore then displayed four posterboards concerning Eady.

142.    One of the posterboards contained text reading "WHO IS THIS HO?" and

contained several photographs depicting Eady.

143.    Moore pointed to each photograph on this posterboard and stated, "Brit Eady is her name. It's the same girl."

144.    Moore also referred to Eady as a "trap ho video ho," implying that Eady was currently or formerly engaged in prostitution.

145.    Eady has never engaged in prostitution and Moore's statement to the contrary was false.

146.    As the crowd watched, Moore continued to make false statements regarding Eady's purported sexual history, stating "Britney does escort," and "she charged $1400 per appointment."

147.    As stated above, these statements were false because Eady has never engaged in prostitution.

148.    Most egregiously, however, Moore then displayed a posterboard that contained several photographs of Eady in revealing outfits and—in the instance that is at the center of this lawsuit—a graphic photograph of a woman purported to be Eady engaging in a sexual act with another person.

149.    Specifically, the photograph depicted a woman performing fellatio on a man.

150.    Although the woman's face in the photograph is clearly depicted (as is the sex act that she is performing), the man's face is not depicted.

151.    Moore represented to the crowd that Eady was the woman depicted in the explicit photograph.

152.    In reality, however, the explicit photograph did not depict Eady, but instead depicted a different, unknown woman performing fellatio on another unknown person and/or was

a "deepfake."[1]

153.    On information and belief, Moore knew or should have known that the photograph did not actually depict Eady.

154.    Moore's conduct violated Defendant Truly's sexual harassment policies, which prohibits, for example, "[d]isplaying or distributing sexually suggestive or derogatory objects, pictures, cartoons, or posters or any such items."

155.    Moreover, the foregoing conduct of Moore constituted, at the minimum, an attempt to violate the revenge porn laws in Georgia (*see* GA Code § 16-11-90 ("Prohibition on nude or sexually explicit electronic transmissions")) and New York (*see* N.Y. Penal Law § 245.15 ("Unlawful dissemination or publication of an intimate image")).[2]

156.    On information and belief, Moore's entire speech at the Salon Event, as well as images of all of the posterboards that Moore displayed, were captured on the cameras that the Defendants used to film the event.

157.    On information and belief, Moore did not exhibit any similar conduct toward any male employee of Defendants.

158.    Moore's actions were in furtherance of the business of the Defendants because Moore acted to create spectacle and drama at an event that was filmed for use on RHOA, an act which was routinely encouraged and sought after by the Defendants.

159.    Moore's actions were within the scope of her employment with Defendant Truly.

160.    After Moore displayed the posterboard that contained the explicit photograph,

---

[1] A "deepfake" is "an image or recording that has been convincingly altered and manipulated to misrepresent someone as doing or saying something that was not actually done or said." https://www.merriam-webster.com/dictionary/deepfake?

[2] Similarly, earlier this year the federal TAKE IT DOWN Act was enacted into law, which makes the nonconsensual publication of intimate images (including deepfakes) a federal crime. *See* 47 U.S.C. § 223; *see also* https://www.congress.gov/crs-product/LSB11314?.

multiple other cast members and attendees of the Salon Event expressed strong disapproval of Moore's actions and left the event early out of disgust.

161.    Cast member Shamea Morton later said, "I could not believe my eyes."

162.    Several cast members said that it was "too far."

163.    Cast member Porsha Williams later said, "I am mortified.  I did not want to stand there and seem like I was in agreement of anything.  I don't support this."

164.    Cast member Shamea Morton said, "But this?  This is too much."

165.    Cast member Angela Oakley said, "I empathize with [Brit] because I can only imagine the pain that it may cause anyone who's exposed that way."

166.    In reaction to the shocking events, Williams said that she did not want to be on camera anymore and asked Defendants' crew to remove her mic and to "act like [she] was never even at this event."

167.    Indeed, the Salon Event ended early and immediately after Moore demonstrated the photo due to Moore's shocking behavior.

168.    The shock, express disapproval, and immediate departure of these other castmates demonstrate that none of those castmates expected this type of behavior to occur during their employment with Defendant Truly or their involvement in the show.

169.    Cast member Kelli Ferrell approached Eady in the parking lot of the salon to tell her what had happened.

170.    She and Eady sat in a car and did not allow the cameras to follow them.

171.    In the privacy of the car, Ferrell stated that Moore had shown photographs of Eady naked and performing a sex act and that Moore stated that Eady had engaged in prostitution.

172.    Eady asked Ferrell for more detail about the photograph, but Ferrell stated that she

had left as soon as the explicit photograph was shown and did not get a good look.

173. Ferrell was mistaken that the explicit photograph depicted Eady.

174. After this interaction, Eady and Ferrell left the van.

175. Two RHOA producers approached Eady and apologized for Moore's conduct.

176. Eady left the location before the other cast members exited the salon.

177. Based on the representations of Ferrell and the producers, Eady believed that the explicit photograph depicted her.

178. Eady currently does not have knowledge of how Moore obtained the photographs she displayed and the false information that she disseminated at the Salon Event; however, prior to the Salon Event, Defendant Truly possessed knowledge of (false) rumors concerning Eady's sexual history that had circulated on Internet forums.

**IV.** **Eady Reports the Incident at the Salon Event to Defendants and Defendants Conduct an Immediate Investigation and Then Suspend Moore from the Show a Week Later**

179. Following the incident, Eady specifically and immediately reported Moore's harassing conduct to Defendants.

180. Indeed, on June 7, 2024, the day after the Salon Event, Eady texted RHOA producers the statutory language of O.G.C.A. 16-11-90, Georgia's revenge porn law, and later that day texted those same producers "now I need to know everything that was on those posters for legal reasons."

181. That day, Defendant Truly executives, including Haughton-Lawson, Cox, and Humphrey, called Eady to discuss the incident.

182. On information and belief, Haughton-Lawson and Cox called Eady from their offices in New York City, while Humphrey was in Atlanta.

183. During the call, Eady was distraught and emotional.

184.    She asked what the producers were going to do about what had happened to her.

185.    Haughton-Lawson said that they were going to investigate the incident and "get it handled."

186.    Cox apologized for the incident and said that Eady could take "as much time off" as she needed.

187.    On the call, Humphrey stated that she had no idea what Moore had planned.

188.    Eady was skeptical because Humphrey knew that Eady did not want to attend the Salon Event and she had pushed Eady to go (*see supra* at ¶¶ 124–30).

189.    On the call, Eady asked to see the photographs that Moore had displayed.

190.    Haughton-Lawson, Cox, and Humphrey said that it was "too soon" and that they would have to review the footage and investigate.

191.    Soon after the incident, Eady had seen posts on Instagram and other social media sites discussing the incident at the Salon Event.

192.    Bloggers and media organizations began contacting Eady for a comment on the story.

193.    Eady was also the subject and target of harassing comments on social media.

194.    Additionally, the online rumors were fueled by the post of a cast member, Drew Sidora, who generally confirmed in a post on Twitter the incident at the Salon Event.

195.    During the call the day after the Salon Event, Eady reported to Haughton-Lawson, Cox, and Humphrey about these online posts, media outreach, and harassment she had received, as well as Sidora's post.

196.    Soon after the Salon Event, an audio recording taken at the event leaked, allowing Eady to hear exactly what Moore had said during the event.

197.    On information and belief, Defendants reviewed the footage of Moore's speech and the posterboards she displayed and conducted an investigation.

198.    Within a week of the June 6, 2024 incident, Defendants suspended Moore from filming of the sixteenth season of RHOA specifically due to her presentation of the graphic pornographic photo purportedly depicting Eady.

199.    Indeed, on or around June 14, 2024—well before any episodes of Season 16 had aired—a source associated with RHOA made the following statement to Entertainment Tonight: "Kenya was suspended for allegedly depicting Brittany performing a sexual act at the grand opening of her Kenya Moore Hair Spa in Atlanta, from images allegedly found online. The network is still reviewing the content Kenya displayed during filming."

200.    As she had previewed the day after the incident (*see supra* at ¶¶ 179–80), in the weeks and months that followed Eady repeatedly told the show's producers that she intended to seek legal relief concerning Moore's sexually harassing and illegal use of revenge porn against her.

201.    Defendants thus knew that Moore's presentation of that photograph was not just potentially illegal, but also beyond the bounds of their show, their own internal rules, and the expectations of its participants and fans.

202.    As Moore confirmed in a YouTube video she posted on April 19, 2025, Moore was forced to engage a local attorney to seek legal advice about her actions, and in particular whether they violated revenge pornography laws.

**IV.    Despite Suspending Moore for Her Horrific Sexual Harassment of Eady, Defendants Themselves Sexually Harass Eady by Soliciting and Filming Discussion of the Salon Incident for Months, Forcing Eady to Discuss and Reference Her Sexual History on Camera, and Effectively Airing the Incident the Following Year**

203.    Despite Cox's assurance the day after the Salon Event that Eady could take as much

time off after the Salon Event that she needed (*see supra* at ¶ 186), only two or three days later, Humphrey began calling Eady and telling her that she needed to go back to work and would not be paid if she did not resume filming.

204.    During this time, two other castmates had informed Eady that Defendants had been filming them discussing the incident at the Salon Event.

205.    Due to the significant time commitment demanded from her during the filming of RHOA, Eady did not have time to focus on her other businesses, and her only significant source of income at this time was her per-episode pay for RHOA.

206.    Eady did not want to resume filming or discuss the incident on camera, but she was repeatedly and persistently pressured by Defendants to do so.

207.    Producers encouraged Eady to be "as emotional as possible" and to "get it all out" on camera, meaning to discuss the incident at the Salon Event in detail.

208.    The producers encouraged Eady to "take control of the narrative" by discussing the incident, and said, in sum and substance, "the better we get this out, the better the fans will understand and have empathy with you."

209.    Cox compared the situation to "the Kim Kardashian sex tape," meaning that Eady should use the Salon Event incident for positive publicity.

210.    Despite encouraging Eady to discuss the incident on camera, Defendants did not inform Eady that the explicit photograph did not depict her, nor did they allow Eady to view the photograph that Moore had displayed.

211.    In other words, Defendants allowed Eady to believe the photograph did depict her (which it did not).

212.    In the face of this pressure, Eady repeatedly and consistently told the Defendants

27

that she was not comfortable discussing the incident at the Salon Event.

213.    Eady also informed Cox and Humphrey that she found it "extremely difficult" to discuss the incident in front of her family.

214.    Defendants, however, coerced Eady into discussing the photograph and the incident on camera (including in front of her family).

215.    Not only did they collectively pressure her into thinking it was in her best interest to do so, but they also effectively told her she would get little to no camera time—and potentially no payment—if she did not do so.

216.    Faced with this immense and coordinated campaign, Eady ultimately gave in to pressure to discuss the incident.

217.    During Eady's first filming day after the Salon Event—which came after several days of Defendants' pressuring Eady to discuss the incident despite her protestations—producers employed by Defendant Truly filmed Eady discussing the event with her husband and with Ferrell.

218.    On camera, Eady discussed the public reaction to the incident, stating, "I have had all of Kenya's minions, my friends, my colleagues, my business partners, DMing me, I've been getting texts…[Moore] doesn't even realize the damage she has caused."

219.    Because Eady was falsely led to believe that the explicit photograph depicted her, and because of pressure from producers, Eady was also forced to discuss her sexual history and to do so on camera.

220.    The producers also orchestrated a conversation between Eady and her mother on the same day, which was filmed.

221.    The producers pressured Eady to speak to her mother about the incident at the Salon Event, and by doing so, to discuss her sexual history with her mother on camera during an

extremely sensitive and vulnerable time.

222.    Eady also discussed on camera the emotional and psychological effect that the public response to the incident had caused, stating, "This ordeal has definitely taken a toll on my mental [health], 100%. Every time I get on social media, there is an article on this. Everything when you Google my name is now this situation. You can't remove what's now on the internet…So I'm going to have my guard up, because I just don't know what to expect from this group of ladies."

223.    During this period, Eady repeatedly had sessions with one of Defendants' psychiatrists, Dr. Alessa Herbosch, to discuss the trauma of the Salon Event.

224.    After Eady restarted filming, Eady tried to learn more from crew members about what exactly Moore had shown on the posterboards.

225.    On set, Eady asked Cox if she could see the footage from the event showing the posterboards Moore had displayed.

226.    Cox responded that the footage was "property of Bravo" and that she could not show it to Eady.

227.    Cox's assertion was non-sensical because Eady was subject to a confidentiality agreement and because provisional versions of episodes and content were routinely shared with RHOA participants prior to airing.

228.    On information and belief, the crew members had also been instructed not to substantively discuss the incident at the Salon Event with Eady.

229.    On set, Eady asked crew members if they had captured footage of the posterboards.

230.    In response to Eady's questions, crew members would say only that they "stopped filming before [Moore] brought out the posterboards."

231.    These statements were obviously non-sensical and false, perhaps shown most clearly by the fact that (as discussed *infra* ¶ 259), Defendants ultimately aired certain footage of the posterboards in the episodes they aired the following year.

232.    Both during filming and in moments of privacy, Eady's castmates continued to discuss the incident at the Salon Event with her.

233.    In late June, after the filming of an episode on location in Nashville, a cast member told Eady that another cast member, Sidora, had given Moore the information used on the posterboard.

234.    On information and belief, this conversation was not filmed.

235.    As alleged below, Defendants again forced Eady to discuss the incident at the Salon Event months later while filming confessional segments after the main taping of the series ended.

236.    On information and belief, despite Eady's clear anguish from the Salon Event and protestations about Moore's sexual harassment, Defendants encouraged and facilitated other castmates to make unwanted, highly offensive, sexually explicit comments to Eady on camera.

237.    On or around June 18, 2024, castmate Drew Sidora asked Eady, "Did you ever sell it? . . . The cat?" referring to prostitution.

238.    On or around July 5, 2024, castmate Angela Oakley told Eady that she had "stretch marks" and "miles around [her] mouth," referring to fellatio.

239.    Castmate Shamea Morton repeatedly told Eady she was a "whore" on camera, including on or around August 14, 2024.

240.    These comments violated (among other things) Defendant Truly's Workplace RITW Policy.

241.    On information and belief, Defendants took no remedial action against these

castmates' sexual harassment of Eady.

242.    RHOA confessional segments were filmed between September of 2024 and March of 2025.

243.    All confessionals were filmed at a studio in Atlanta.

244.    During the filming of confessionals, producers would request that cast members discuss the events of each episode as though they had just happened to give the impression that the confessionals were filmed contemporaneously with the rest of the series.

245.    During the filming of confessionals, producers would also give cast members information and details that they had not had before in order to prompt a response.

246.    Despite Eady (again) saying to the producers in no uncertain terms that she did not want to further discuss the incident at the Salon Event during these confessionals, Cox pressured Eady to discuss the incident in detail, to be as "emotional as possible" about the incident, and to reference her sexual history during the segments.

247.    Eady (again) gave in to pressure from Cox because she did not want to lose her job at RHOA or lose her opportunity to receive bonuses.

248.    On information and belief, between the beginning of filming and March 9, 2025, Defendant Bravo edited the footage obtained from filming of the cast to produce episodes of RHOA.

249.    The sixteenth season of RHOA premiered on March 9, 2025.

250.    On information and belief, Defendant Bravo was responsible for all decisions regarding editing of the episodes, creating and distributing advertisements for the series, and the ultimate airing of the episodes.

251.    On information and belief, each episode of RHOA and each advertisement for

RHOA was edited in and broadcast from New York City.

252.    Prior to the premiere, Defendants produced and released promotional material for the new season that referenced the incident at the Salon Event to stir up drama and titillate viewers.

253.    For example, on January 30, 2025, Bravo posted a video to its YouTube channel titled "Sneak Peek: Your First Look at The Real Housewives of Atlanta Season 16."

254.    The video included a depiction of Moore at the Salon Event displaying a poster to guests and stating, "who is this ho? Brit Eady is her name," followed by shots of guests at the event gasping.

255.    The next scene cut to a depiction of Eady crying and saying, "she thinks this is okay?"

256.    Taken together, the scenes clearly depict Moore making harmful statements about Eady.

257.    The premiere of Season 16 of RHOA introduced Eady by making reference to one of the most humiliating aspects of the aftermath of the Salon Event.

258.    Specifically, while other cast members were introduced by references to their marriages and friendships, the first line spoken by Eady that was used in the show was, "All in a split second, everything changed. Now I have to talk about sucking dick with my mother."

259.    On April 7, 2025, Episode 5 of RHOA aired and broadcast significant portions of Moore's sexually harassing behavior at the Salon Event.

260.    In particular, the episode depicted Moore stating, "I did a little research and I found out who this bitch is," and displaying posterboards containing blurred-out photographs with some visible text.

261.    The episode showed a posterboard that read, "WHO IS THIS HO," accompanied

by photographs that were blurred out.  Nevertheless, the episode depicts Moore pointing to the blurred photographs and stating, "Brit Eady is her name. It's the same girl."



262.    The episode next showed Moore stating that her "private investigators found some more evidence for me," and displaying another posterboard.

263.    The second posterboard was also displayed with blurred photographs.

264.    As the posterboard was displayed, the episode showed Moore stating, in reference to Eady, "She used to be a video ho. She was a trap ho video ho."

265.    Next, the episode depicted Moore stating, "then they kept sending me information," and holding up another posterboard.

266.    The contents of the posterboard were not visible on the episode.

267.    The episode then depicts gasps and sounds of shock from the guests at the Salon Event.

268.    Next, the episode cuts to a black screen that contained text stating, "Due to the graphic nature of these photographs, Bravo has chosen not to exhibit them."



269.    Despite ostensibly claiming that the photographs were too graphic to be displayed, the Defendants edited the episode to not only describe in detail what was depicted, but to imply that the graphic photograph actually depicted Eady.

270.    Specifically, immediately after the above screen was displayed, a voiceover from an unknown cast member played in which the cast member stated, "ain't nobody trying to see this girl sucking nobody's dick, that is just so crazy."



271.    Thus, even though the episode did not depict the photograph itself, the Defendants' editing of the episode clearly represented to the viewers that Moore had displayed a photograph that depicted Eady performing fellatio.

272.    Both in clips of the incident and confessional portions filmed thereafter, cast members expressed their mortification and shock that explicit photographs, purported to be of Eady, were displayed.

273.    At the conclusion of the episode, another black screen was displayed that contained the text, "Based on Kenya's behavior, the decision was made to cease filming with her this season."



274.    During the week of April 7, 2025, Eady was required by Defendants to travel to New York City to appear on *Watch What Happens Live*, a show broadcast on Bravo in which cast members of Bravo's reality television franchises discuss recent episodes with producer Andy Cohen.

275.    During the three days she was required to be in New York City, Eady also did several interviews with New York City-based media outlets pursuant to Bravo's scheduled itinerary.

276.    While Eady was in New York City, RHOA producers, including Cox and Bassaragh, invited Eady to have dinner with them privately.

277.    While at dinner, Eady again asked Cox and Bassaragh if she could see the actual

footage depicting the posterboards Moore had displayed.

278.    Cox and Bassaragh replied that they thought they could make it happen but did not indicate that they would take any steps to show Eady the photograph (nor did they take any such steps).

279.    In fact, despite Eady's repeated requests to the Defendants to see the photograph displayed at the Salon Event, none of the Defendants or their employees or agents ever showed Eady the photograph or any recordings or images of the posterboard that contained the photograph.

280.    At the same dinner in New York City, Cox and Bassaragh told Eady that she was approved to appear on Season 17 of RHOA.

281.    However, Cox and Bassaragh also informed Eady at the same time that the show planned to bring Moore back for Season 17 despite what Moore had done.

282.    Indeed, Cox and Bassaragh even asked Eady how she would feel about filming with Moore again for Season 17, and they asked in a manner unequivocally suggesting that it was not a choice for Eady, but that if she wanted to continue filming for Season 17, she would have to do so alongside Moore.

283.    Eady was horrified and traumatized to learn at this dinner that the Defendants were still inclined to employ Moore after Moore had egregiously sexually harassed her and that they were willing to subject Eady to working with Moore again.

284.    Eady was equally horrified and traumatized to learn at this dinner that Defendants were actually conditioning Eady's continued employment in Season 17 on her working with Moore, her harasser.

285.    Each of the participants at that dinner knew that Eady had suffered significant emotional distress from Moore's harassing actions, yet they insisted on Eady appearing on the next

season with Moore.

286.    Eady was thus faced with a decision to (i) continue employment with Moore, or (ii) walk away from RHOA entirely (as alleged below, she chose the latter).

287.    On April 15, 2025, Episode 6 of the Sixteenth Season of RHOA aired.

288.    Episode 6 depicted Eady speaking about the incident at the Salon Event and discussing her sexual history, *see supra* at ¶¶ 219–22, which Eady would not have done had the Defendants not forced her to resume filming and pressured her to discuss these topics while she was in a vulnerable and emotional state.

289.    In or around late May 2025, Eady heard from a fellow castmate that two castmates—Shamea Morton and Kelli Ferrell—who had previously called Eady a "whore" on camera, were planning on falsely accusing Eady of having undergone a vaginal rejuvenation surgery with forged medical documentation at the reunion in June 2025.

290.    This false accusation was intended to insinuate that Eady was a prostitute.

291.    On May 29, 2025, Eady emailed director Toni Tonge of NBC to express her concerns about the ongoing harassment campaign against her.

292.    Eady wrote her email in the context of the forthcoming filming of the "reunion" episode for Season 16, which was to be attended by each of the castmastes and was scheduled for June 5, 2025.

293.    Eady wrote, "I feel like this is an opportunity to try to silence me, and that whatever will take place at the reunion is no longer just a work environment, but a hostile smear campaign at best."

294.    Eady also had a call with several executives where she reiterated her concerns.

295.    In response, later that day, Halajian, Defendant Truly's Business and Legal Affairs

Director, who had previously sent Defendant Truly's anti-discrimination and anti-retaliation policies to each of the castmates before filming, *see supra* at ¶¶ 108–12, sent an email to the castmates attaching the "Truly Original Anti-Violence Policy" (but not sending the anti-discrimination or anti-retaliation policies).

296.    However, on information and belief, Defendants did not take any corrective action.

297.    In June 2025, Eady for the first time saw a photograph of the posterboard Moore displayed that contained the photograph that was purported to be an explicit image of herself and she immediately recognized that the woman in the photograph was not her.

298.    Because of her concerns of the ongoing sexual harassment and Defendants' failure to take corrective action, Eady also declined to appear at the Season 16 reunion taped on or around June 5, 2025.

299.    For example, Eady feared that castmates Morton and Ferrell would harass her by falsely accusing her of having undergone the vaginal rejuvenation surgery and calling her a prostitute.

300.    Eady was scheduled to appear for another taping of *Watch What Happens Live* in New York City on June 9, 2025, but felt compelled to decline in light of the aftermath of the airing of the incident at the Salon Event and the ongoing sexual harassment of her.

301.    At the taping, which aired live, castmate Drew Sidora sang, "Brit, the world wants to know—are you a OH?  And did you sell it?"

302.    Producer Andy Cohen looked shocked and responded, "okay."

303.    On July 14, 2025, Eady informed the public that she would not accept Defendants' invitation to return for Season 17, noting "I still have a lot of healing left to do, but you can't heal in the same place that got you sick."

304.    Later that same day, she further explained: "The events of this season have devastated me."

305.    Eady declined to pursue appearing on Season 17 due to Defendants effectively conditioning that employment on working with Moore again and due to the devastation she suffered at the hands of the Defendants following the Salon Event.

306.    The impacts of Defendants' sexual harassment have been widespread and devastating.

307.    Had Defendants not engaged in the conduct that they engaged in following the Salon Event, Eady would have accepted the invitation to return for Season 17 and beyond and would have enjoyed all of the financial, reputational, and personal benefits that would have provided.

308.    As a result, Eady suffered significant damage to her brand and earnings potential from endorsements.

309.    Although Eady has felt the impact of Defendants' sexual harassment all over the country and especially in her home base of Atlanta, she has felt a significant impact of that harassment in New York City.

310.    As alleged above, certain of the most harassing conduct occurred in person while she was in New York City performing her functions as an employee of Defendants.

311.    Eady's largest following on social media (which she monetizes)—and nearly double that of any other geographical region, including Atlanta—is from people based in New York.

312.    Eady thus carefully and specifically protects her image and reputation amongst New York audiences and regularly seeks efforts to promote herself in the New York City area.

313. However, Eady was deprived of New York and New York City-based job opportunities with Defendants because, had she returned for Season 17, she would have taped additional episodes in New York City, including episodes of *Watch What Happens Live* and the season reunion, which had previously been filmed in New York City.

314. Eady was also deprived of other New York City-based opportunities.

315. Before Episode Six had aired, Eady had been in talks with hotels and New York City-based brands and venues about doing appearances in New York City for financial compensation.

316. Eady had a particular interest in doing this New York-based work because of its lucrative nature, its ability to expand her reach in her most popular geographic area, and because her husband is from New York City.

317. However, in the aftermath of Episode Six airing, Eady was informed that these venues and brands no longer had an interest because of concerns with Eady's image following the Salon Event and Eady thus lost the opportunities.

318. As a result of Defendants' conduct, Eady has suffered severe emotional damages and concomitant physical manifestations.

319. In the immediate aftermath of the Salon Event, Eady experienced severe depressive moods and anxiety, and felt as though she was not going to survive what had happened to her.

320. To this day, Eady experiences severe feelings of depression and anxiety as well as insomnia.

321. Eady also fears leaving her house and appearing in public due to the humiliation and trauma she experienced.

322. Eady has been unable to receive psychological or psychiatric help because she

experiences severe anxiety about her privacy being violated and worries that if she attempts to receive medical treatment, her private medical information will be revealed to the public and used to further humiliate her.

323.    Eady has lost business opportunities due to her depressive symptoms.

324.    Eady has difficulty getting out of bed or leaving the house and has therefore missed meetings and other opportunities for business development.

325.    Eady has also suffered reputational harm as a result of her public sexual harassment, which has harmed her personal and business relationships, cost her business opportunities, and resulted in a total loss of privacy in her daily life.

## COUNT I

**Discrimination on the Basis of Sex/Gender**
**N.Y. Exec. Law § 296(1)(a), (h)**
**Defendants Truly and Bravo**

326.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

327.    Eady was an "employee" of Defendants under the definition of the New York Executive Law.

328.    Defendants are "employer(s)" and "covered entit(ies)" under the definition of the New York Executive law.

329.    At all relevant times, Eady was a female in both sex and gender, and was thus a member of a protected group.

330.    Eady was an "individual" in an "employment" relationship with Defendants for purposes of the New York Executive Law.

331.    Defendants discriminated against Eady on the basis of sex and gender and subjected Eady to unwelcome and unwanted sexual harassment based on sex and gender in the ways described

in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of her sex and gender at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex and gender; and encouraging other employees to demean her at her work on the basis of her sex and gender, such as by calling Eady a whore and suggesting that Eady is a prostitute.

332. The foregoing conduct of the Defendants created a hostile work environment for Eady, significantly altered and affected the terms, conditions, and privileges of her employment, and caused Eady to suffer public humiliation and ridicule, depression, anxiety, insomnia, fear of leaving the house, and reputational damages.

333. The foregoing conduct of the Defendants also constituted *quid pro quo* harassment because it involved a situation where submission to or rejection of sexual conduct was explicitly and implicitly made a term or condition of Eady's employment and was used as the basis for employment decisions.

334. The foregoing conduct did not rise to the level of petty slights or trivial inconveniences, as judged from the perspective of a reasonable victim with the same protected characteristics.

335. Defendants not only knew or should have known of the foregoing sexual harassment of Eady, they condoned, ratified, and encouraged the above-described discriminatory behavior, which was perpetuated by employees of the Defendants in their roles as producers, interviewers, showrunners, and castmates, and the Defendants failed to take any or sufficient

effective or remedial action as to such conduct.

336.    On information and belief, Defendants did not subject male cast members and staff to sexual harassment and inappropriate conduct.

337.    Defendants acted intentionally or with reckless indifference.

338.    Defendants also constructively discharged Eady by deliberately creating working conditions so intolerable, difficult, or unpleasant that a reasonable person would have felt compelled to decline continued employment.

339.    Specifically, Defendants deliberately conditioned Eady's continued employment on appearing on Season 17 of RHOA with Moore, who had sexually harassed Eady, which Defendants knew.

340.    Defendants thus compelled Eady to involuntarily decline continuing her employment with Defendants.

341.    As a direct and proximate result of the above, Eady has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y. Exec. Law § 296(1)(a).

## COUNT II

### Discrimination on the Basis of Sex/Gender
### N.Y.C. Admin. Code §§ 8-107(a)(1), 8-502
### Defendants Truly and Bravo

342.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

343.    Defendants were each an "employer" and a "covered entity" for purposes of Section 8-107.

344.    At all relevant times, Eady was a female in both sex and gender.

345.    Defendants engaged in an unlawful discriminatory practice by discriminating

against Eady and subjecting her to unwelcome and unwanted sexual harassment because of her gender and her sexual decisions in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of her gender and sexual decisions at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her gender and sexual decisions; and encouraging other employees to demean her at her work on the basis of her gender and sexual decisions, such as by calling Eady a whore and suggesting that Eady is a prostitute.

346.    The foregoing conduct of the Defendants created a hostile work environment for Eady, significantly altered and affected the terms, conditions, and privileges of her employment, and caused Eady to suffer public humiliation and ridicule, depression, anxiety, insomnia, fear of leaving the house, and reputational damages.

347.    The foregoing conduct of the Defendants also constituted *quid pro quo* harassment because it involved a situation where submission to or rejection of sexual conduct was explicitly and implicitly made a term or condition of Eady's employment and was used as the basis for employment decisions.

348.    The foregoing conduct did not rise to the level of petty slights or trivial inconveniences, as judged from the perspective of a reasonable victim with the same protected characteristics.

349.    Defendants not only knew or should have known of the foregoing sexual harassment of Eady, they condoned, ratified, and encouraged the above-described discriminatory

behavior, which was perpetuated by employees of the Defendants in their roles as producers, interviewers, showrunners, and castmates, and the Defendants failed to take any or sufficient effective or remedial action to as to such conduct.

350.    On information and belief, Defendants did not subject male cast members or staff to sexual harassment and inappropriate conduct.

351.    Defendants acted intentionally or with reckless indifference.

352.    Defendants also constructively discharged Eady by deliberately creating working conditions so intolerable, difficult, or unpleasant that a reasonable person would have felt compelled to decline continued employment.

353.    Specifically, Defendants deliberately conditioned Eady's continued employment on appearing on Season 17 of RHOA with Moore, who had sexually harassed Eady, which Defendants knew.

354.    Defendants thus compelled Eady to involuntarily decline continuing her employment with Defendants.

355.    As a direct and proximate result of the above, Eady is a "person aggrieved by an unlawful discriminatory practice" and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y.C. Admin Code 8-502.

## COUNT III

### Discrimination on the Basis of Sex and Gender
### Atlanta Code of Ordinances Art. V § 94 *et seq.*
### Defendants Truly and Bravo

356.    Eady re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

357.    The Defendants are "Employer(s)" and Eady was at all relevant times an

"Employee" under the Atlanta Code of Ordinances Article V § 94-111.

358.    Defendants engaged in an unlawful employment practice by discriminating against Eady and subjecting her to unwelcome and unwanted sexual harassment because of her sex, gender identity, and gender expression in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of sex, gender identity, and gender expression at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex, gender identity, and gender expression; and encouraging other employees to demean her at her work on the basis of her sex, gender identity, and gender expression, such as by calling Eady a whore and suggesting that Eady is a prostitute.

359.    The foregoing conduct of the Defendants created a hostile work environment for Eady, significantly altered and affected the terms, conditions, and privileges of her employment, and caused Eady to suffer public humiliation and ridicule, depression, anxiety, insomnia, fear of leaving the house, and reputational damages.

360.    The foregoing conduct of the Defendants also constituted *quid pro quo* harassment because it involved a situation where submission to or rejection of sexual conduct was explicitly and implicitly made a term or condition of Eady's employment and was used as the basis for employment decisions.

361.    On information and belief, the Defendants condoned and encouraged the above-described discriminatory behavior, which was perpetuated by producers, interviewers, showrunners, and castmates and the Defendants failed to take any effective or remedial action to

guard against such conduct.

362.    On information and belief, Defendants did not subject male cast members and staff to sexual harassment and inappropriate conduct.

363.    Defendants acted intentionally or with reckless indifference.

364.    Defendants also constructively discharged Eady by deliberately creating working conditions so intolerable, difficult, or unpleasant that a reasonable person would have felt compelled to decline continued employment.

365.    Specifically, Defendants deliberately conditioned Eady's continued employment on appearing on Season 17 of RHOA with Moore, who had sexually harassed Eady, which Defendants knew.

366.    Defendants thus compelled Eady to involuntarily decline continuing her employment with Defendants.

367.    As a direct and proximate result of the above, Eady has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation.

## <u>COUNT IV</u>

### Retaliation
### N.Y. Exec. Law § 296(7)
### Defendants Truly and Bravo

368.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

369.    Eady was an "employee" of Defendants under the definition of the New York Executive Law.

370.    Defendants are "employer(s)" and "covered entit(ies)" under the definition of the New York Executive Law.

371.    Eady was an "individual" in an "employment" relationship with Defendants for purposes of the New York Executive Law.

372.    Eady engaged in protected activity under the New York Executive Law by opposing practices forbidden under Section 296, specifically sexual harassment of Eady in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of sex, gender identity, and gender expression at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex, gender identity, and gender expression; and encouraging other employees to demean her at her work on the basis of her sex, gender identity, and gender expression.

373.    Eady engaged in protected activity in the ways described in the foregoing paragraphs, including but not limited to informing Defendants that she was subject to illegal revenge pornography on June 7, 2024, and later texting, "now I need to know everything that was on those posters for legal reasons," and opposing Defendants' attempts to make her discuss the Salon Event incident and the photograph on camera.

374.    Eady had a good-faith, reasonable belief that she was opposing, protesting, and resisting sexual harassment.

375.    Defendants knew that Eady engaged in protected activity.

376.    Defendants' threats to not pay Eady if she did not discuss the Salon Event and photograph on camera, including in front of her mother, constitute conduct that was reasonably likely to deter a reasonable employee in Eady's position from engaging in protected activity.

377.    Defendants also subjected Eady to a retaliatory hostile work environment by encouraging their employees to repeatedly make unwanted, offensive, sexual comments to Eady and not disciplining or otherwise preventing and promptly correcting that conduct.

378.    Defendants undertook their retaliatory actions because Eady opposed sexual harassment, and those threats came in close temporal proximity with Eady's protected activity.

379.    On information and belief, Defendants condoned and encouraged the above-described retaliatory behavior, which was perpetuated by producers, interviewers, showrunners, and castmates and the Defendants failed to take any effective or remedial action to guard against such conduct.

380.    Defendants acted intentionally or with reckless indifference.

381.    Defendants also constructively discharged Eady by deliberately creating working conditions so intolerable, difficult, or unpleasant that a reasonable person would have felt compelled to decline continued employment.

382.    Specifically, Defendants deliberately conditioned Eady's continued employment on appearing on Season 17 of RHOA with Moore, who had sexually harassed Eady, which Defendants knew.

383.    Defendants thus compelled Eady to involuntarily decline continuing her employment with Defendants.

384.    As a direct and proximate result of the above, Eady has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y. Exec. Law § 296(7).

## COUNT V

**Retaliation**
**N.Y.C. Admin. Code § 8-107(7)**
**Defendants Truly and Bravo**

385.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

386.    Defendants were each an "employer" and a "covered entity" for purposes of Section 8-107.

387.    Eady engaged in protected activity under Section 8-107 by opposing a practice forbidden by the chapter, specifically sexual harassment of her in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of sex, gender identity, and gender expression at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex, gender identity, and gender expression; and encouraging other employees to demean her at her work on the basis of her sex, gender identity, and gender expression.

388.    Eady engaged in protected activity in the ways described in the foregoing paragraphs, including but not limited to informing Defendants that she was subject to illegal revenge pornography on June 7, 2024, and later texting, "now I need to know everything that was on those posters for legal reasons," and opposing Defendants' attempts to make her discuss the Salon Event incident and the photograph on camera.

389.    Eady had a good-faith, reasonable belief that she was opposing, protesting, and resisting sexual harassment.

390.    Defendants knew that Eady engaged in protected activity.

391.    Defendants' threats to not pay Eady if she did not discuss the Salon Event and photograph on camera, including in front of her mother, constitute conduct that was reasonably likely to deter a reasonable employee in Eady's position from engaging in protected activity.

392.    Defendants also subjected Eady to a retaliatory hostile work environment by encouraging their employees to repeatedly make unwanted, offensive, sexual comments to Eady and not disciplining or otherwise preventing and promptly correcting that conduct.

393.    Defendants undertook their retaliatory actions because Eady opposed sexual harassment, and those threats came in close temporal proximity with Eady's protected activity.

394.    On information and belief, the Defendants condoned and encouraged the above-described retaliatory behavior, which was perpetuated by producers, interviewers, showrunners, and castmates and the Defendants failed to take any effective or remedial action to guard against such conduct.

395.    Defendants acted intentionally or with reckless indifference.

396.    Defendants also constructively discharged Eady by deliberately creating working conditions so intolerable, difficult, or unpleasant that a reasonable person would have felt compelled to decline continued employment.

397.    Specifically, Defendants deliberately conditioned Eady's continued employment on appearing on Season 17 of RHOA with Moore, who had sexually harassed Eady, which Defendants knew.

398.    Defendants thus compelled Eady to involuntarily decline continuing her employment with Defendants.

399.    As a direct and proximate result of the above, Eady is a "person aggrieved by an unlawful discriminatory practice" and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation pursuant to N.Y.C. Admin Code § 8-502.

### COUNT VI

**Retaliation**
**Atlanta Code of Ordinances Art. V § 94 *et seq.***
**Defendants Truly and Bravo**

400.    Eady re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

401.    The Defendants are "Employer(s)" and Eady was at all relevant times an "Employee" under the Atlanta Code of Ordinances Article V § 94-111.

402.    Eady engaged in protected activity by opposing a practice forbidden by Atlanta Code of Ordinances Article V § 94, specifically  sexual harassment of her in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of sex, gender identity, and gender expression at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex, gender identity, and gender expression; and encouraging other employees to demean her at her work on the basis of her sex, gender identity, and gender expression.

403.    Eady engaged in protected activity in the ways described in the foregoing paragraphs, including but not limited to informing Defendants that she was subject to revenge pornography on June 7, 2024, and later texting, "now I need to know everything that was on those

posters for legal reasons," and opposing Defendants' attempts to make her discuss the Salon Event incident and the photograph on camera.

404.    Eady had a good-faith, reasonable belief that she was opposing, protesting, and resisting sexual harassment.

405.    Defendants knew that Eady engaged in protected activity.

406.    Defendants' threats to not pay Eady if she did not discuss the Salon Event and photograph on camera, including in front of her mother, constitute conduct that was reasonably likely to deter a reasonable employee in Eady's position from engaging in protected activity.

407.    Defendants also subjected Eady to a retaliatory hostile work environment by encouraging their employees to repeatedly make unwanted, offensive, sexual comments to Eady and not disciplining or otherwise preventing and promptly correcting that conduct.

408.    Defendants threatened Eady's employment (including the conditions thereof) because she opposed sexual harassment, and those threats came in close temporal proximity with Eady's protected activity.

409.    Defendants thus intimidated, harassed, retaliated, obstructed, or discriminated against Eady because Eady opposed an unlawful practice under the Atlanta Code of Ordinances Article V § 94.

410.    On information and belief, the Defendants condoned and encouraged the above-described retaliatory behavior, which was perpetuated by producers, interviewers, showrunners, and castmastes and the Defendants failed to take any effective or remedial action to guard against such conduct.

411.    Defendants acted intentionally or with reckless indifference.

412.    Defendants also constructively discharged Eady by deliberately creating working

conditions so intolerable, difficult, or unpleasant that a reasonable person would have felt compelled to decline continued employment.

413.    Specifically, Defendants deliberately conditioned Eady's continued employment on appearing on Season 17 of RHOA with Moore, who had sexually harassed Eady, which Defendants knew.

414.    Defendants thus compelled Eady to involuntarily decline continuing her employment with Defendants.

415.    As a direct and proximate result of the above, Plaintiff has suffered damages, and is entitled to the recovery of damages, including punitive damages, as well as reasonable attorneys' fees, costs, and other compensation.

**COUNT VII**

**Breach of Contract**
**New York Law**
**Defendant Truly**

416.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

417.    On April 19, 2024, Eady and Defendant Truly entered into a Talent Agreement to govern their employment relationship.

418.    The Talent Agreement selected New York law as governing law.

419.    The Talent Agreement provided that "Artist's employment hereunder shall be subject to Studio's and Network's other applicable policies and procedures as may be amended from time to time, including, without limitation, rules of conduct, such as providing a respectful workplace (including anti-harassment and anti-discrimination), prohibition of violence in the workplace, and relating to the consumption of alcohol and drugs (collectively, 'Production Policies')."

420.    On May 10, 2024, Halajian sent Eady and the other castmates Truly's "Respect in the Workplace Policy" that was incorporated by the Talent Agreement and that outlined robust commitments on sexual harassment and retaliation. *See supra* ¶ 111.

421.    The Talent Agreement also provided that "In connection with Artist's Services, Artist may be in an environment where Artist may hear, see, or encounter speech or physical contact, or otherwise experience sensations, that Artist or others may consider offensive. Artist shall immediately notify Studio if for any reason Artist feels harassed (e.g., due to Artist's race, nationality, sex, age, disability, sexual orientation or marital status), threatened or otherwise uncomfortable in connection with Artist's Services, and Artist understands that Studio shall not, and shall not authorize anyone else to, penalize or retaliate against Artist for doing so."

422.    Eady performed her obligations under the Talent Agreement.

423.    Eady reported Moore's sexual harassment to Defendant Truly in several instances.

424.    However, Defendant Truly penalized and retaliated against Eady for making these reports.

425.    Defendant Truly's conduct constitutes a breach of the Talent Agreement.

426.    Defendant Truly also promised Eady that her "employment hereunder shall be subject to Studio's and Network's other applicable policies and procedures as may be amended from time to time, including, without limitation, rules of conduct, such as providing a respectful workplace (including anti-harassment and anti-discrimination)," including the Truly Respect in the Workplace Policy.

427.    Defendant Truly breached this obligation by subjecting Eady to unwelcome and unwanted sexual harassment because of her sex, gender identity, and gender expression in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting

Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of sex, gender identity, and gender expression at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex, gender identity, and gender expression; and encouraging other employees to demean her at her work on the basis of her sex, gender identity, and gender expression, such as by calling Eady a whore and suggesting that Eady is a prostitute.

428.    Defendant Truly's conduct constitutes a breach of the Talent Agreement.

429.    Defendant Truly's conduct was willful, wanton, abusive, in bad faith, purposefully intended to harm and punish Eady (and were thus accompanied by special circumstances of humiliation and indignity), extraordinarily culpable behavior, and independently tortious.

430.    Eady suffered damages as a result of Defendant Truly's breach, including consequential and punitive damages.

## COUNT VIII
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### New York Law
### Defendant Truly

431.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

432.    On April 19, 2024, Eady and Defendant Truly entered into a Talent Agreement to govern their employment relationship.

433.    The Talent Agreement selected New York law as governing law.

434.    Under New York law, implied in every contract is a covenant of good faith and fair dealing.

435.    Eady performed her obligations under the Talent Agreement.

436.    Defendant Truly breached the implied covenant of good faith and fair dealing in the ways described in the foregoing paragraphs, including but not limited to, repeatedly subjecting Eady to probing questions at her work about an explicit pornographic photograph; forcing Eady to discuss, at her work and on camera, her private sexual history in relation to the explicit pornographic photograph and doing so on the threat of termination; forcing Eady to make statements that demeaned her on the basis of sex, gender identity, and gender expression at work and doing so on the threat of termination; demeaning Eady at her work on the basis of her sex, gender identity, and gender expression; and encouraging other employees to demean her at her work on the basis of her sex, gender identity, and gender expression, such as by calling Eady a whore and suggesting that Eady is a prostitute.

437.    Defendant Truly's conduct deprived Eady of the right to receive the benefits of the Talent Agreement.

438.    Defendant Truly's conduct was willful, wanton, abusive, in bad faith, purposefully intended to harm and punish Eady (and were thus accompanied by special circumstances of humiliation and indignity), extraordinarily culpable behavior, and independently tortious.

439.    Eady suffered damages as a result of Defendant Truly's breach, including consequential and punitive damages.

### COUNT IX

**Negligence**
**Georgia Law**
**Defendants Truly and Bravo**

440.    Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

441.    Eady and Moore were employees of Defendants under Georgia law and Defendants

were employers under Georgia law.

442.    Under Georgia law, Defendants had a duty to Eady as an employer to exercise ordinary care in retaining and supervising their employees and their conduct.

443.    Moore sexually harassed Eady by, *inter alia*, engaging in an attempted act of "revenge porn" by displaying posters purportedly showing Eady engaged in a sexual act, falsely claiming that Eady engaged in prostitution, and making other derogatory and harassing sexual comments regarding Eady.

444.    Moore's conduct was within the scope of her employment with Defendants and in furtherance of Defendants' business.

445.    Defendants not only knew about but ratified Moore's conduct by, *inter alia*, using the incident to their advantage to generate controversial storylines, film scenes of Eady's emotional distress, and gain publicity for the season.

446.    Defendants failed to sufficiently act to remediate Moore's conduct.

447.    An employer exercising reasonable care that knew about Moore's conduct would have taken prompt and effective action to limit the harm caused by Moore's conduct, including but not limited to not forcing Eady on the threat of termination to openly discuss the sexually harassing incident in the workplace and not telling Eady that Moore would be invited back to the show.

448.    As a direct and proximate result of Moore's conduct and of the Defendants' ratification of that conduct, Plaintiff suffered severe harm.

449.    O.G.C.A. § 34-7-22 provides that "[a]ll contracts between employer and employee made in consideration of employment, where the employer is exempted from liability to the employee arising from the negligence of the employer or his employees, as such liability is fixed

by law, shall be null and void, as against public policy."

## COUNT X

### Intentional Infliction of Emotional Distress
### New York and Georgia Law
### Defendants Truly and Bravo

450.   Eady hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

451.   The foregoing conduct of Defendants and Moore was extreme and outrageous so as to go beyond all bounds of decency in a civilized community.

452.   Defendants and Moore intended to cause severe emotional distress to Eady.

453.   In the alternative, Defendants and Moore acted recklessly and disregarded a substantial probability of causing severe emotional distress to Eady.

454.   The foregoing conduct of Defendants and Moore directly caused Eady's emotional distress.

455.   Eady suffered severe emotional distress.

456.   Defendants are liable to Eady for their own intentional infliction of emotional distress but are also liable to Eady for Moore's intentional infliction of emotional distress under the principle of *respondeat superior*.

## PRAYER FOR RELIEF

WHEREFORE, Eady prays for relief and demands judgment in her favor on each of her claims against Defendants as follows:

(a)   Declaring and adjudging that Defendants' acts alleged herein violated Eady's rights under the laws of the State of New York, the City of New York, the State of Georgia, and the City of Atlanta;

(b)   Entering judgment in favor of Eady and order that Eady shall recover

(i)     compensatory damages against each of the Defendants, jointly and severally, to compensate Eady for her economic damages, including backpay and front pay, past, present, and future pain, suffering, and other hardships arising from the Defendants' conduct; and

(ii)     punitive damages against each Defendant;

(c)     Awarding Eady the costs of the suit herein, including but not limited to attorney's fees;

(d)     Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 20, 2025

By: _____

*Benjamin D. White*

**BLOCH & WHITE LLP**
Benjamin D. White, Esq.
Kyle Bigley, Esq.*
90 Broad St., Suite 703
New York, New York 10004
(212) 702-8670
bwhite@blochwhite.com
kbigley@blochwhite.com

*Attorneys for Plaintiff Brittany Eady*

*\*S.D.N.Y. Application Forthcoming*